```
UNITED STATES DISTRICT COURT                         NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
DILARA YESMIN,                                    :
                                                  :
                    Plaintiff,                    :
                                                  :        AMENDED MEMORANDUM &
         - against -                              :        ORDER
                                                  :
RITE AID OF NEW YORK, INC. and                    :
GENOVESE DRUG STORES, INC.                        :        CV 10-4157(ERK)(RER)
                                                  :
                    Defendants.                   :
----------------------------------------------------------- X
```

KORMAN, J.:

      Dilara Yesmin filed a complaint against Rite Aid of New York, Inc. and Genovese Drug Stores, Inc. ("defendants"), after being terminated, alleging entitlement to overtime pay under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), and discriminatory termination in violation of the New York City Human Rights Law. After the completion of discovery, defendants moved for summary judgment on the grounds that (1) plaintiff, as a bona fide executive, was exempt, as a matter of law, from the overtime pay requirements of both the FLSA and NYLL, and (2) plaintiff failed to establish that she was selected for termination during a reduction in workforce because of discrimination against her "because of her race, age, religion, ethnicity, and/or national origin." Am. Compl. ¶ 24.

## FACTS

      The plaintiff is a Muslim 48 year old women of South Asian descent. Yesmin Aff. ¶ 11. She was an employee of Rite Aid for approximately nine years, beginning in early 2001 until her termination in July 2010. Defs.' R. 56.1 Stmt. ¶ 3; Yesmin Aff. ¶ 2. In April 2007, plaintiff was promoted from a shift supervisor to a co-manager. Defs.' R. 56.1 Stmt. ¶¶ 6-7; Yesmin Dep. 167:8-9. She held this position, during her last three years of employment, at three different Rite

Aid stores (Store Nos. 1805, 4858 and 10601). Defs.' R. 56.1 Stmt. ¶¶ 7-9. Upon becoming a co-manager, plaintiff received training in her new areas of responsibility, including payroll, scheduling employees, ordering merchandise, procedures for handling recalled or damaged products, procedures for implementing price changes, and maintaining inventory. Defs.' R. 56.1 Stmt.¶ 11; Yesmin Dep. 195:17-198:25. In her new position, plaintiff received a salary of $1,350 bi-weekly, which had increased to $1,418 bi-weekly by the time she was terminated. Defs.' R. 56.1 Stmt. ¶¶ 13-14.

As co-manager, plaintiff was the second highest ranked employee in the store and had supervisory authority over the shift supervisors and hourly employees. Yesmin Dep. 327:12-23. Plaintiff testified, during her deposition, that her manager was not there for "most [of] the time" that she was scheduled to work at Store 1805. *Id.* 213:4-7. Nevertheless, she presents some conflicting information in her affidavit and raises a question as to exactly how many hours in a week her schedule and her manager's overlapped at Store 1805.[1] *Id.*; Yesmin Aff. ¶ 4; Defs.' R. 56.1 Stmt. ¶ 26. At Store 4858, plaintiff was the highest ranking manager in the store 30 to 35

---

[1] Although plaintiff testified at her deposition that her hours overlapped with her store manager a total of five to six hours per week, she states in her affidavit that she had misunderstood the question, and in fact, it was five to six hours per day. *Compare* Yesmin Dep. 217:14-21 *with* Yesmin Aff. ¶ 4. The deposition transcript on this issue indicates that plaintiff was confused with the questions posed to her and was unable to provide a clear answer. *See generally* Yesmin Dep. 213:19-217:21. From plaintiff's other statements during her deposition, it appears that she did indeed mean that her schedule overlapped with the store manager's a few hours each a day:

> Q. So how many hours that weak [sic] of those 55 to 60 hours would you overlap with him?
> A. Maybe three -- when he come 3 o'clock or 2 o'clock, I work with him until like 6, 7.
> Q. So three or four hours on the days that you are both there?
> A. Four or five hours, sometime.
> Q. So three to five hours a day when you are both there?
> A. If he come 2 o'clock, then one hour.

Yesmin Dep. 217:4-16. A comprehensive review of the plaintiff's deposition transcript supports the statement in her affidavit that her work scheduled overlapped with the manager's at Store 1805 about five to six hours per day.

hours of the 55 to 60 hours per week that she was scheduled to work, and 35 to 40 hours each week at Store 10601. Defs.' R. 56.1 Stmt. ¶¶ 27-28.

At Stores 1805 and 4858, plaintiff was responsible for at least two hourly employees who were scheduled to work with her. *Id.* ¶¶ 30-31. For Store 10601, plaintiff disputes defendants' statement that she "had one to three hourly employees working with her during the day if she was the opening manager," *id.* ¶ 32. *See* Yesmin Aff. ¶ 5 ("[A]t Store 10601, it regularly happened that there was only one hourly employee working with me -- in the morning."). Defendant cites plaintiff's deposition testimony, where she testified that she would initially have one hourly employee working with her, but that two more employees would report to work during the course of her shift. *See* Defs.' Reply R. 56.1 Stmt. ¶ 32. Defendant's representations of plaintiff's testimony cannot be verified because those pages of the deposition have not been provided. *Id.* (citing pp. 255-56). Nevertheless, during another part of her deposition, plaintiff testified that even with the schedule at Store 10601,[2] she "had two to three people with [her] a lot of the time." Yesmin Dep. 338:7-10. Plaintiff seems to be attempting to fabricate a material issue of fact over a minor point, i.e., she did not have two employees with her during *every* hour she was scheduled to work at Store 10601.

**Plaintiff's Responsibilities as Co-Manager**

As co-manager, plaintiff was responsible for assisting the store manager with managing the operation of the store, including implementing the company's business plans to make the store profitable. Defs.' R. 56.1 Stmt. ¶¶ 20-21; Yesmin Dep. 327:24-328:2. When plaintiff was the opening manager, she ensured the store was clean and did a walk through to identify the tasks that needed to be completed that day. Yesmin Dep. 335:7-23. She then assigned the various

---

[2] Plaintiff testified that Store 10601 is "a smaller store." Yesmin Dep. 381:10. The smaller size of the store explains the reason that she did not have more employees on staff with her at all times.

tasks to either herself or the employees, using her discretion on who was best suited for each job. *Id.* at 338:11-21; 339:9-18. After giving the employees their assignments, plaintiff ensured that they timely and properly completed their tasks. *Id.* at 341:21-342:2. If an employee was not properly performing the task, plaintiff would coach the employee by demonstrating how to complete the assignment. *Id.* at 342:4-12. Plaintiff estimated that she spent between 30 minutes to an hour each day checking the work of the employees and coaching them. *Id.* at 347:6-15.

If an employee did not improve after two or three conversations, plaintiff used her authority to issue the employee a written warning. *Id.* at 342:13-344:11. Plaintiff issued written discipline notices to employees for various reasons, including poor work performance, dress code violations, cash register overages/shortages, attendance issues, tardiness and misconduct in the workplace. *Id.* at 347:21-349:23. Specifically, plaintiff recalled disciplining two employees -- one who had reported to work intoxicated, and another who lost a piece of store equipment. *Id.* at 350:3-351:1. Although plaintiff testified that she believed she had the authority to fire an employee, she consulted with her manager regarding terminations. *Id.* at 351:3-25. Plaintiff also gave her store managers input on the employees she supervised for their written performance evaluations. *Id.* at 364:3-7. When the store managers presented the employees with their reviews, plaintiff occasionally attended the meetings. *Id.* at 364:14-23; 366:21-23 (testifying that she was not present at meetings in Store 10601). She also identified for the manager employees who were doing a good job, so they could be recognized with gift cards or gold stars. *Id.* at 367:17-25.

As co-manager, plaintiff was involved with hiring. She identified for the manager which applicants should be interviewed, would sometimes interview the candidates with the manager, and gave feedback on whether a candidate should be hired. *Id.* at 368:19-369:20. Her co-

manager responsibilities included (1) training employees on Rite Aid's policies and procedures and performing different tasks, from working the register to stocking merchandise, *id.* at 369:25-370:18, (2) ensuring employees completed their required monthly or weekly computer trainings, *id.* at 371:11-19, and (3) handling employee questions or concerns, such as questions about sick days and vacation time, *id.* at 377:21-378-18.

Plaintiff also handled customer complaints about the store's employees or unavailable products. *Id.* at 382:1-6. When the complaint was about an unavailable sale item, plaintiff used her discretion to substitute another product or give the customer a rain check. *Id.* at 382:12-383:4. For customers who needed a specific item, she had the authority to place special orders that the store did not carry or obtain them from another store. *Id.* at 383:5-384:14.

At her deposition, plaintiff testified that she tried to review the store's financial reports daily to identify which items were selling and not selling in the store, and whether there were register overages or shortages. *Id.* at 385:19-388:5. The opening manager or the one working on Sunday, she stated, would total the numbers on the overages, shortages, and voids daily, and at the end of the week, would total all the numbers for a final store report. *Id.* at 388:16-389:5. She also spent a maximum of 30 to 40 minutes a day reviewing the timekeeping reports to ensure that the employees had properly punched in and out, and to verify any errors by speaking with the employees. *Id.* at 389:6-25; 392:7-10. In direct opposition to her deposition testimony, and without any other verification, plaintiff states in her affidavit that she "did not review financial reports . . . or check time-keeper reports on a daily basis." Yesmin Aff. ¶ 6. Moreover, she states that she did not spend 30 to 40 minutes a day reviewing other reports. *Id.* However, "[i]t is beyond cavil that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition

5

testimony.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 454-55 (2d Cir. 1999) (quoting *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) (citations omitted)).

When cashiers finished their shifts, plaintiff verified their till by counting the money in their register and filling out a cashier reconciliation report. Yesmin Dep. 392:11-395:11. The process took about six to seven minutes per register if there were no issues, and up to fifteen minutes when there was a discrepancy. *Id.* at 395:12-396:12. If there was a discrepancy between the register and till, plaintiff had to investigate and write the employee up if she could not resolve the discrepancy. *Id.* at 396:13-19. Plaintiff reconciled between five to seven registers during her shifts. *Id.* at 399:5-18. Moreover, as part of the management team, plaintiff had access to and was responsible for the money in the store safe. *Id.* at 415:9-23. This responsibility included collecting money from the registers throughout the day and placing it in the safe. *Id.* at 424:7-425:15.

To further minimize employee theft, plaintiff was required to check employees' bags every time they left the store, approve any employee purchases, and any voids, exchanges or customer returns that were made. *Id.* at 411:19-413:15. Plaintiff testified that the number of voids she approved in a day ranged from 10 to 30, and that she spent on average 30 minutes a day responding to requests from cashiers for manager approval of these transactions. *Id.* at 420:1-25. When a customer did not have a receipt for an item she wanted to return, plaintiff had discretion to decide whether to accept the return. *Id.* at 413:23-414:22.

Plaintiff was responsible for ordering merchandise for the store, using both the Rite Aid system that registered how many of each item had sold, placing a manual order by walking to shelves, and ordering certain items, such as bread and alcohol, directly from the vendors. *Id.* at 434:5-442:23. Vendor orders were placed each week, and plaintiff had to decide how much to

order. *Id.* at 442:16-23. Once the items were delivered, plaintiff would verify and sign off on the delivery. *Id.* at 443:15-23. Finally, as part of the management team, plaintiff was responsible for preparing bank deposits (approximately four to five a day), which took her about 40 to 75 minutes a day. *Id.* at 456:25-457:6; Defs.' R. 56.1 Stmt. ¶ 89.

In addition to her supervisory and management responsibilities as co-manager, plaintiff's duties included manual labor, such as cleaning the bathrooms, sweeping the sidewalks, wiping down the windows, moving merchandise, organizing magazines on shelves, and crushing boxes. Yesmin Aff. ¶ 8.

## DISCUSSION[3]

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### B. Claims under the FLSA

Under the FLSA, employers must pay employees, subject to certain exceptions, overtime compensation for time worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The

---

[3] Plaintiff argues that defendants' summary judgment motion should not be considered because it is untimely. Nevertheless, because plaintiff was on notice that she is required to come forward with all necessary evidence and did so, there is good cause for me to consider the defendants' motion, even if it is untimely, without wasting further time and resources. *See Hastie v. J.C. Penney Co., Inc.*, 886 F. Supp. 1017, 1031-32 (W.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)); *Horton v. Williams*, 2010 WL 3338920, at *2 (N.D.N.Y. Aug. 24, 2010).

7

statute provides a categorical exemption for employees who work in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Defendants contend that plaintiff was a bona fide executive, and therefore, was exempt from the overtime requirements under both the FLSA and NYLL.

The exemptions under the FLSA are to be narrowly construed, and the "employer bears the burden of proving that its employees fall within an exempted category of the Act." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted). Although 29 U.S.C. § 213 does not define "bona fide executive," federal regulations provide that a bona fide executive is any employee who (1) is "[c]ompensated on a salary basis at a rate of not less than $455 per week;" (2) "[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) "customarily and regularly directs the work of two or more other employees; and" (4) "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a). "[I]t is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements." *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 174 (E.D.N.Y. 2005); *see also Krumholz v. Vill. of Northport*, -- F. Supp. 2d --, 2012 WL 2775029, at *5 (E.D.N.Y. July 10, 2012).

The plaintiff argues that she was not a bona fide executive because she earned only slightly more than non-exempt employees, her primary duty did not involve management related activities, and she was closely supervised. The only evidence plaintiff provides for her assertion that she earned only slightly more than non-exempt employees is her affidavit statement that she

is "aware of one shift supervisor who was paid $15 to $16 per hour as her regular rate." Yesmin Aff. ¶ 10. This unsupported statement is insufficient to establish that she earned only slightly more than shift supervisors. Moreover, although plaintiff only compares her pay to that of shift supervisors, she also supervised cashiers who were earning less than the shift supervisors.

Plaintiff's argument that her primary duties did not involve management is also meritless. The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's primary duty, a court must consider all the facts in a case, "with the major emphasis on the character of the employee's job as a whole." *Id.* The code identifies a list of non-exhaustive facts that a court should consider in determining the employee's primary duty, including: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.*

Because "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption," 29 C.F.R. § 541.106(a), the code provides some illustrative examples of exempt executives. The code explains, for example, that an assistant manager in a retail establishment is not precluded from the exemption even if he performs nonexempt tasks, "such as serving customers, cooking food, stocking shelves and cleaning the establishment . . . if the assistant manager's primary duty is management." *Id.* § 541.106(b). The nonexempt tasks, such as serving customers and stocking shelves, can occur simultaneously as supervising employees and directing their work. *Id.*

The difference between exempt executives and nonexempt employee is that the former makes "the decision regarding when to perform nonexempt duties and remain[s] responsible for the success or failure of business operations under their management while performing the nonexempt work." *Id.* § 541.106(a). The nonexempt employee, on the other hand, "generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Id.* Thus, assistant managers who perform exempt management work for less than 50% of the time, are "closely supervised and earn little more than the nonexempt employees . . . generally would not satisfy the primary duty requirement." *Id.* § 541.700(c).

Considering the character of the plaintiff's job as a whole, it is easy to see that the defendants have met their burden of showing that she was a bona fide executive. Plaintiff's testimony reveals that she had tremendous amount of discretion in performing many of her tasks and that she managed the store while concurrently undertaking her nonexempt tasks. When she was the opening manager of the store, plaintiff created the task lists for the day and made the assignments to the employees, including herself, using her discretion of who would best perform the tasks. Yesmin Dep. 335:7-23; 338:11-21; 339:9-18. She was the highest ranking employee during the majority of her scheduled hours at two, if not three, of the stores she served as co-manager. She generally supervised at least two employees, except for maybe Store 10601, a smaller store where she had only one other employee with her in the morning, but two or three hourly employees "a lot of the time." *Id.* at 338:7-10. The fact that plaintiff was also supervised by the store manager, who was the highest ranked employee in the store, does not diminish her management of the other employees and the operation of the store.

Moreover, plaintiff's nonexempt tasks, such as cleaning and organizing magazines on the shelves, were minor compared to her primary duty of managing the store and the hourly

employees. Plaintiff's responsibilities as co-manager were paramount to the success and profitability of her stores: (1) she monitored the employees to ensure they performed their tasks properly and did not steal; (2) she monitored the cash flow through the registers and safe, and the number of voids entered; (3) she handled the inventory of the store ensuring the proper items were ordered; (4) she used her discretion to resolve customer complaints; and (5) she was involved in hiring, reviewing and disciplining employees. These tasks and responsibilities, which were necessary for the stores' operations, occurred throughout her scheduled shift, without the store manager's specific directions. Thus, defendants are entitled to summary judgment, as a matter of law, on the plaintiff's FLSA claim.

## CONCLUSION

Defendants' motion for summary judgment is granted on the FLSA cause of action. Because I decline to exercise supplemental jurisdiction over plaintiff's state law claims, they are dismissed without prejudice.

**SO ORDERED.**

Brooklyn, New York
September 6, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge